IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, )
)
Plaintiff )
)
vs ) 20-CR-228
)
KURT MORAN, )
)
Defendant )
______________________________)

TRANSCRIPT OF PROCEEDINGS
*Change of Plea*
BEFORE THE HONORABLE ROBERT D. MARIANI
MONDAY, DECEMBER 6, 2021; 9:00 A.M.
SCRANTON, PENNSYLVANIA

FOR THE GOVERNMENT:
MICHELLE OLSHEFSKI, ESQ.
Assistant United States Attorney
235 N. Washington Avenue
Suite 311
Scranton, Pennsylvania 18503

FOR THE DEFENDANT:
ROBERT J. LEVANT, ESQ.
Levant Law, PC
538 Spruce Street, Suite 414
Scranton, Pennsylvania 18503

BRIAN J. McMONAGLE, ESQ.
McMonagle, Perri & McHugh, PC
Suite 701, One Penn Square West
30 South 15th Street
Philadelphia, Pennsylvania 19102

Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

THE COURT: Good morning, everyone. This is the matter of United States v. Kurt Moran. Preliminarily, I want to begin by noting that Rule 5 of the Federal Rules of Criminal Procedure was amended on October 21 of 2020 to require Courts to give both oral and written notice of the Government's Brady disclosure obligations, "on the first scheduled court date, when both the prosecutor and defense counsel are present".

And in this particular case, the first opportunity to provide that notice is today, because Magistrate Judge Mehalchick had the initial hearing in this case on September 16 of 2020, so I am, in accordance with the amendment of Rule 5, I'm giving that notice today.

And that notice, Dr. Moran, is that I'm issuing an order confirming that the United States has an obligation to timely disclose Brady information to you. Brady is the name of a United States Supreme Court case, the full name is Brady v. Maryland. Your counsel, no doubt, is familiar with it.

And I remind Government counsel that failure to comply with these obligations may result in consequences, such as, the exclusion of evidence, dismissal of charges, contempt proceedings, disciplinary referral, and any other relief authorized by law, in addition, I have entered on the docket, as of Friday, as required, a written order confirming these obligations.

With that matter out of the way, Dr. Moran, I understand

that, although, you initially entered a plea of not guilty in this case, it's your intention here today to change that plea and enter a guilty plea to several of the counts of the indictment.

Before I can accept your plea, there are certain matters I need to determine, in fact, that's the purpose of this hearing.

First, I need to determine you're competent to plead at this time. I also need to determine that you have had the assistance of counsel, that you understand your trial rights, because these are the rights you'll be giving up if you plead guilty, that you understand the nature of the charges against you, that your plea, if you offer one, is voluntary, and that there is a factual basis to support your plea.

So to begin this process, I'm going to have you placed under oath, and I'm going to ask you questions about this matter. Before I do that, I want you to understand that I will interrupt these proceedings as many times as necessary to allow you to consult with counsel. All you need do is indicate that you wish to speak to counsel, and I will temporarily interrupt the proceedings or allow you to do so.

Now, once you're sworn, you need to answer my questions truthfully. False answers to my questions could subject you to prosecution for perjury or false statement. And when you give me truthful answers to my questions, you'll be waiving and, of course, waiving, as I'm sure you know, means giving up your

right not to testify against yourself. Some of your answers to my questions will be incriminating, with respect to the charges against you.

Lastly, you need to understand, for me to accept your plea, you'll have to admit your guilt.

Now, so far, do you understand what I've told you?

THE DEFENDANT: Yes, sir, yes, Judge.

THE COURT: All right, let's continue. You are a licensed medical professional in the Commonwealth of Pennsylvania?

THE DEFENDANT: Yes, Your Honor.

THE COURT: How long have you been so licensed -- before I go any further, I'm going to have my courtroom deputy swear you in.

(At this time the Defendant was sworn.)

THE COURT: All right, so let's continue here. In order to become a licensed medical professional in Pennsylvania, what was your educational requirements, beginning with college?

THE DEFENDANT: I'm a little hard of hearing, Your Honor. My education?

THE COURT: Yes.

THE DEFENDANT: After college or with college?

THE COURT: Beginning with college.

THE DEFENDANT: I went to the University of Scranton, I graduated from there, Bachelor of Science. And my first two years, I went to the University of -- actually, I went six

months to the University For Foreigners in Perugia and studied, in part, at that time, and I went to the University of Rome, thereafter. After that, since it's a six-year curriculum in Italy, I transferred to American University down in the British West Indies, which I spent two years there, and then I did my clinical training at Cook County General in Chicago, and Norwegian American, also, and Presbyterian, in Chicago.

After that, I graduated from medical school, and I went to St. Vincent's Medical Center in New York City to do my Internal Medicine residency.

THE COURT: Please continue.

THE DEFENDANT: After that, I decided to come back home to Scranton. I was admitted to the Cardiology Residency Program at St. Vincent's, but I decided to come home, and I did come home, back in 1987, I believe -- I'm sorry, Your Honor, '88 -- and I practiced Internal Medicine for the next -- well, until today.

I trained back in 2000 and 2001 and 2 to get my boards in Pain Management, for which I did, by The American Academy of Pain Management.

THE COURT: Is that a Board certification?

THE DEFENDANT: It is.

THE COURT: Thank you. Continue, please.

THE DEFENDANT: But I was never boarded in Internal Medicine, because I did not take them, due to medical issues with my children.

THE COURT: How many children do you have?

THE DEFENDANT: I have six -- I have five, now, but I had six. So it seemed like every time I signed up for the boards all the time, and every time they came around, my two boys were sick. They have certain maladies, cystic fibrosis, which, the fall is not a very good time for them, so it was, like, unbelievable, every time my boards would come around, they were either in CHOP, at St. Christopher's in Philadelphia, and so, finally, after about five years, I just said, forget it, I don't need my boards, I'm an internist, I'll do whatever I could do, and felt I have done a great job with that since then. But that's why I'm not boarded.

THE COURT: I understand. Thank you. Within the last 24 hours, have you taken any drugs that would interfere with your ability to understand the nature of these proceedings?

THE DEFENDANT: No, sir, no, Your Honor.

THE COURT: Have you consumed any alcohol within the last 24 hours?

THE DEFENDANT: Yes, sir, yes, Your Honor.

THE COURT: When was that?

THE DEFENDANT: Last night

THE COURT: Last night?

THE DEFENDANT: Yes, sir.

THE COURT: What was it?

THE DEFENDANT: It was wine. I never drank until I went to

00:20 Italy, then, all of a sudden, they got me on wine.
00:20 THE COURT: Can I conclude that you are sober, as you sit here today?
00:20 THE DEFENDANT: Yes, Your Honor.
00:20 THE COURT: Can you tell me, Doctor, whether, in the past, you've ever been treated for a mental illness or a mental condition?
00:20 THE DEFENDANT: No, Your Honor.
00:20 THE COURT: Likewise, I assume, you have never been hospitalized for those reasons, as well?
00:20 THE DEFENDANT: That is correct, Your Honor.
00:20 THE COURT: Counsel, do you have any reservations, with respect to Dr. Moran's competence to offer a plea in this case?
00:20 MR. McMONAGLE: No, Your Honor.
00:20 THE COURT: Ms. Olshefski?
00:20 MS. OLSHEFSKI: No, Your Honor.
00:20 THE COURT: Now, I'm going to talk to you about the assistance of counsel you've had from Mr. Levant and Mr. McMonagle. How long have they represented you in this case?
00:21 THE DEFENDANT: Oh, boy. I think, Attorney Levant, almost three years, and Attorney McMonagle, probably, about a year and a half to two years.
00:21 THE COURT: In the course of that time period, have you had enough time to talk with your lawyers about this case?
00:21 THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: In the course of speaking with your lawyers, have you told them everything you know about this case and the allegations against you?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: Are you satisfied with the advice that Mr. Levant and/or Mr. McMonagle have given you?

THE DEFENDANT: Extremely.

THE COURT: Likewise, are you satisfied with the efforts they have made on your behalf?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, you understand that you have been indicted by a Federal Grand Jury, with an indictment consisting of 423 counts, do you understand that?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Have you read the indictment?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: You, also, have a right here today to have me read the indictment to you, in its entirety, verbatim. You can waive that right, if you wish, in which case, I'll simply summarize the charges. How do you wish to proceed?

THE DEFENDANT: I think it would be best to waive that, since I've already read it, Your Honor.

THE COURT: Very briefly, let me summarize what the counts against you are.

Count 1 is entitled, Conspiracy to Defraud the United

States and Pay and Receive Health Care Kickbacks, in violation of Title 18 of the United States Code Section 371. That consists of Paragraphs 39 through 61 of the indictment.

Count 2 covers -- actually, Count 2 through 12 covers the charge of Receipt of Health Care Kickbacks, in violation of Title 42 United States Code Section 1320(a) Section 7b(b)1(B).

Counts 13 through 327 are entitled, Unlawful Distribution of Controlled Substances. In particular, within those counts, one of the counts that is included in your plea agreement is Count 55.

Count 328 is entitled, Unlawful Distribution of a Controlled Substance Resulting In Death and Serious Bodily Injury, in violation of Title 21 United States Code Section 841(a)1.

Count 329 is entitled, Unlawful Distribution of a Controlled Substance Resulting In Death and Serious Bodily Injury, again, in violation of Title 21 United States Code Section 841(a)1, Section 841(b)1(C) and 18 United States Code Section 2. Within these counts, there are a number of paragraphs that detail, precisely, how the Government alleges that you conducted these -- or engaged in these violations.

Count 330 is, also, one of the three counts that your plea agreement makes reference to. This count charges you with maintaining a drug-involved premises, in violation Title 21 United States Code Section 856(a)1 and 18 USC Section 2.

And then Counts 331 through 423 are entitled, Health Care Fraud, alleging violations of Title 18 United States Code Section 1347, and with respect to those counts, among those counts, Count 405 is the third count, which is identified in your plea agreement, as one to which you have agreed to plead guilty.

Now, let me ask you, you said you've read the indictment. Have you discussed the entire indictment with your counsel?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: Do you understand the charges against you?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Did you have questions for your counsel, in connection with your review of the indictment, and if so, were those questions answered to your satisfaction?

THE DEFENDANT: I had many, and they were answered, yes, correctly.

THE COURT: As you sit here today, do you have questions regarding the allegations of the indictment?

THE DEFENDANT: At this time, I do not.

THE COURT: Counsel, without going into the facts of this case, if you would tell me, please, what explanation you have given to your client of the nature of the charges in this case, and, specifically, the charges which have been identified as charges in the plea agreement, to which a guilty plea will be offered.

MR. McMONAGLE: Your Honor, if I may. We have explained the amounts of each of the charges that are set forth in the indictment to which the Defendant is not only charged but, specifically, those to which he has plead, we have identified the factual basis for those charges and the evidence that we're aware of that the Government would establish, in the presentation of their case in chief.

We have reviewed the discovery in this case with the Defendant and what we understand the evidence to be against him. We have satisfied ourselves, and, in turn, answered all questions that Dr. Moran has had about the charges against him, what the elements of those charges are, and what evidence we believe the Government has in their ability to prove guilt beyond a reasonable doubt, as to each of the charges to which he's pleading guilty.

THE COURT: Thank you. All right, let's move on. Now, I want to speak to you about your trial rights because, again, as I mentioned at the outset, these are the rights you're giving up if you plead guilty.

First, do you understand that, under the Constitution of this country and the laws of the United States, you are entitled to a trial by jury on these charges?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that you have a right to plead not guilty?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand if you plead not guilty, you have a right to a speedy trial, you have the right to see and hear all the witnesses called to testify against you, you have the right to use the subpoena power of this Court to compel the attendance of witnesses at trial, and, at trial, your counsel would have a right to cross-examine witnesses on your behalf?

Do you understand that you have these rights if you plead not guilty and proceed to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that, at trial, you would be presumed to be innocent, and the Government would be required to prove you guilty by competent evidence beyond a reasonable doubt before you could be found guilty, and that you, yourself, would not have to prove that you are innocent, because the burden of proof remains, at all times, on the Government? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand, as well, that a trial, while you would have the right to testify if you chose to do so, you would also have the right not to testify, and if you did not testify, no inference or suggestion of guilt could be drawn from the fact that you did not testify. Do you understand that?

THE DEFENDANT: I do, yes, Your Honor.

THE COURT: If this trial were a jury trial, do you understand that the jury would be composed of twelve lay persons who would be selected at random, that you and your counsel would have an opportunity, as part of the jury selection process, to seek to exclude prospective jurors for cause, if any bias or other ground of disqualification were shown, with respect to that prospective juror, and that there are no limits on your ability to challenge prospective jurors for cause? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In addition to your right to attempt to exclude prospective jurors for cause, as I've explained it, do you understand that you would also have the right to exclude a certain limited number of jurors, without having to show cause, by using what are called peremptory challenges? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: This has been explained to you by counsel?

THE DEFENDANT: It has.

THE COURT: All right. And do you understand that the jury would have to agree unanimously, each and every one of them, on a verdict of guilty, before you could be found guilty? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: While we have talked about your right to a trial

before a jury, do you understand, if you and the Government and the Judge all agreed, you would have a right to a trial before a judge without a jury? Do you understand that?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: And, normally, if you were found guilty at trial, you would have a right to appeal, however -- and we will talk about this at length in a moment -- your plea agreement contains a waiver of your right to appeal in Paragraph 30.

Do you know that? You can speak with counsel, if you wish.

(At this time the Defendant conferred with counsel.)

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand?

THE DEFENDANT: Yes, sir.

THE COURT: Now, Dr. Moran, do you understand that if you plead guilty here today and I accept your plea, there will be no trial, and instead, I will enter a finding of guilty on your plea, and I will sentence you, not today, at a later date, I will sentence you on the basis of your plea, after I receive and I consider a Pre-Sentence Report from the Probation Office? Do you understand that? Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Now, I know filed of record in this case is a plea agreement. Counsel, do you have a copy of the plea agreement to show to Dr. Moran?

THE DEFENDANT: Yes, sir.

THE COURT: If you would, please, go to the last page of the document, Page 37. Are you there?

THE DEFENDANT: I am.

THE COURT: Doctor, I would refer you to the top of the page under the word, Acknowledgments. Under that word, there are two sentences, and I quote;

I have read this agreement and carefully reviewed every part of it with my attorney. I fully understand it and I voluntarily agree to it. End quote.

And then you'll see the typewritten name, Kurt Moran. Above that typewritten name is a signature. Do you know whose signature that is?

THE DEFENDANT: That's mine, Your Honor.

THE COURT: Now, Doctor, before you signed this plea agreement, did you read it?

THE DEFENDANT: Yes, I did.

THE COURT: Did you discuss it with counsel?

THE DEFENDANT: I did, Your Honor.

THE COURT: At the time that you discussed it with counsel or as many times as you discussed it with counsel, if you had questions, were your questions answered to your satisfaction?

THE DEFENDANT: Yes, they were, Your Honor.

THE COURT: Do you have questions about the text of the plea agreement here today?

THE DEFENDANT: At this time, I don't, Your Honor.

THE COURT: All right, now, to make sure that your understanding of the plea agreement is the same as the Government's, I'm going to ask Ms. Olshefski who represents the Government to summarize the essential terms of the plea agreement.

I will ask you, if you would, please, to listen carefully to Ms. Olshefski, because when she's concluded, I'm going to ask you whether the terms of the plea agreement, as described and summarized by Ms. Olshefski, are the terms as you understand them. All right?

THE DEFENDANT: Yes, sir.

THE COURT: Ms. Olshefski.

MS. OLSHEFSKI: Your Honor, Paragraph 1 of the plea agreement indicates that the Defendant agrees to plead guilty to Count 55 of the indictment, which charges the Defendant with a violation of Title 21 United States Code Section 841(a)1, which is Unlawful Distribution of a Controlled Substance, in this case, Subsys, outside the usual course of professional practice and not for a legitimate medical purpose.

The maximum penalty for the offense is imprisonment for a period of 20 years, a fine of $1 million, a maximum term of supervised release of up to life, but at least three years, to be determined by the Court, and which shall be served at the conclusion of and in addition to any term of imprisonment, the costs of prosecution, denial of certain Federal benefits, and

an assessment in the amount of $100.

The Defendant also agrees to plead guilty to Count 330 of the indictment, which charges the Defendant with a violation of Title 21 United States Code Section 856, which is maintaining drug-involved premises.

The maximum penalty for that offense is imprisonment for a period of 20 years, a fine of $500,000, a maximum term of supervised release of up to life, but at least three years, to be determined by the Court, and which shall be served at the conclusion of and in addition to any term of imprisonment, the costs of prosecution, denial of certain Federal benefits, and an assessment in the amount of $100.

The Defendant also agrees to plead guilty to Count 405, which charges a violation of Title 18 United States Code Section 1347, which is Health Care Fraud.

The maximum penalty for that offense is imprisonment for a period of ten years, a fine of $250,000, a maximum term of supervised release of three years to be determined by the Court, and which shall be served at the conclusion of and in addition to any term of imprisonment, the costs of prosecution, the denial of certain Federal benefits, and an assessment in the amount of $100.

At the time the guilty pleas are entered, the Defendant shall admit to the Court that he is, in fact, guilty of the above offenses, and after sentencing, the United States will

move for dismissal of any remaining counts in the indictment.

Paragraph 3 of the plea agreement refers to the maximum sentence for the multiple counts. The Defendant understands that the total maximum possible sentence for all charges is a combination of penalties described above, and that is 50 years in prison and fines totaling $1,750,000, a lifetime of supervised release but at least three years, the costs of prosecution, denial of certain Federal benefits, and assessments totaling $300.

Paragraph 12 of the plea agreement refers to specific Sentencing Guideline recommendations. With respect to the application of the Sentencing Guidelines to the Defendant's conduct, the Defendant stipulates and agrees as follows:

Subparagraph A. In addition to the counts of conviction, pursuant to United States Sentencing Guidelines Section 1(B)1.2 and 1(B)1.3, which is relevant conduct, the Defendant and the United States stipulate that the Defendant committed the additional offense of knowingly and intentionally distributing Oxycodone and Fentanyl, Schedule 2 controlled substances, outside the usual course of professional practice and not for legitimate medical purposes, and that the death of J.B., as charged in Count 328 of the indictment, resulted from the use of the substances.

Subparagraph B. Based on the foregoing stipulation, the base offense level, under the United States Sentencing

Guidelines Section 2(D)1.1(a)2 is 38.

Subparagraph C, for purposes of the United States Sentencing Guidelines, the parties agree to jointly recommend to the Court that the Defendant be sentenced to a term of 144 months incarceration, a three-year term of supervised release, a fine, if any, to be determined by the Court, restitution as determined by the Court, special assessments totaling $300, and a Forfeiture Order in the amount of $134,00.

The Defendant understands that none of these recommendations are binding upon either the Court or the United States Probation Office, which may make different findings as to the application of the Sentencing Guidelines to the Defendant's conduct.

The Defendant further understands that the United States will provide the Court and the United States Probation Office all information in its possession that it deems relevant to the application of the Sentencing Guidelines to the Defendant's conduct.

Paragraph 14 of the plea agreement refers to Forfeiture. The present indictment in this case seeks forfeiture of the Defendant's interest in certain assets, and the Defendant agrees that certain of the Defendant's property constitutes proceeds of, is derived from proceeds traceable to or was used in any manner or part to commit or facilitate the commission of the offense of conviction and its relevant conduct.

The Defendant agrees to the following, among others:

The Defendant agrees to forfeiture of $134,000 in United States currency, as proceeds of Title 18 United States Code Section 1347 violation, which the Defendant admits he personally obtained and benefited from.

Subparagraph B. Immediate Entry of a Preliminary Order of Forfeiture and/or Filing of a Civil Complaint by the United States.

And C, Waiver of the Right to Personal Service of All Process, and naming Attorney Robert Levant as his agent for service.

And D, Waiver of a Right to Appear and Contest any Portion of the Forfeiture Proceedings, including but not limited to any motion or proceeding for substitute assets, and the filing and entry of a consent decree of forfeiture.

Paragraph 20 refers to Restitution. The Defendant acknowledges that, pursuant to the Mandatory Restitution Act of April 24, 1996, Title 18 United States Code Section 3663(a), the Court is required, in all instances, to order full restitution to all victims for the losses those victims have suffered, as a result of the Defendant's conduct, and the Defendant also agrees that the Government will seek and the Court may impose an Order of Restitution, as to the victims of the Defendant's relevant conduct.

Paragraph 21 evidences the Defendant's agreement to make

full restitution, in accordance with a schedule to be determined by the Court. And the Defendant also agrees that full restitution shall be a condition of any probation or term of supervised release that the Defendant receives.

Paragraph 29 refers to the surrender of the Defendant's DEA registration or the status of his professional license. The Defendant understands and agrees that the Defendant will surrender his DEA registration, which is his DEA authorization to prescribe Schedule 2, 3, 4 and 5 controlled substances, immediately, upon entry of his guilty plea.

That surrender has already taken place, Your Honor.

It is further understood and agreed that the status of any professional license held by the Defendant is not protected by this agreement and is a matter, solely, within the discretion of the appropriate licensing authority.

This is a plea agreement that has, as a material condition, an appeal waiver on direct appeal only, and that is found at Paragraph 30 of the plea agreement. Paragraph 30, specifically, outlines certain sections of Federal law that would otherwise afford the Defendant the right to appeal his judgment of conviction and sentence in this case.

However, as a material condition of this plea agreement, the Defendant is waiving his right to appeal his judgment of conviction and sentence in this case.

Paragraph 35 indicates that the Defendant agrees that he

has discussed this case and this plea agreement in detail with his counsel who has advised the Defendant of his Constitutional and other trial and appellate rights, the nature of the charges, the elements of the offenses the United States would have to prove at trial, the evidence the United States would present at such trial, any possible defenses the Defendant might have, the advisory Sentencing Guidelines and other aspects of sentencing, the potential losses of Civil Rights and privileges and other potential consequences of pleading guilty in this case. The Defendant agrees that he is satisfied with the legal services and advice provided to him by his counsel.

Your Honor, this plea agreement has been signed by the Defendant Dr. Kurt Moran, by both his counsel Robert Levant, Esquire and Brian McMonagle, Esquire, and by myself, on behalf of the United States.

THE COURT: Thank you, Ms. Olshefski. Dr. Moran, did you listen to Ms. Olshefski outline and recite the essential terms of the plea agreement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are the terms of the plea agreement, as outlined and recited by Ms. Olshefski, the terms, as you understand them, sir?

THE DEFENDANT: Could I speak with my lawyers for a few minutes?

THE COURT: Of course, you can.

(At this time the Defendant conferred with counsel.)

MR. McMONAGLE: Thank you, Your Honor.

THE COURT: Do you recall the last question I asked you?

THE DEFENDANT: Could you repeat it, please?

THE COURT: Of course. I asked you if you listened to Ms. Olshefski outline and recite the essential terms of the plea agreement, and then I asked you, are the terms of the plea agreement, as outlined and recited by Ms. Olshefski, the terms of the plea agreement, as you understand them?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Now, just a few more questions about the plea agreement.

In Paragraphs 11 and 12, Paragraph 11 is Acceptance of Responsibility, pursuant to which you may be entitled to a three-level reduction in your total offense level, and Paragraph 12 contains, as Ms. Olshefski outlined, in detail, in fact, read verbatim, Paragraph 12 contains certain paragraphs denoted A, B and C, which indicate recommendations, joint recommendations that will be made to me, which will have an effect on the sentence imposed.

Do you understand, Doctor, that if I were not to accept any of the recommendations that were made that would pertain to a reduction in your offense level, under the Sentencing Guidelines, and, thereby, lower any term of imprisonment, do you understand that if I were not to accept those

recommendations or any of them, you will still be bound by your plea, and you will not have the right to withdraw your plea on the ground that I did not accept any of those recommendations, because I am not a party to this plea agreement? Do you understand that?

THE DEFENDANT: I understand that fully, Your Honor.

THE COURT: And do you understand, likewise, that if the sentence were to be more severe than you expected or different than any estimate, perhaps, that counsel has discussed with you, you will still be bound by your plea, and you will not have the right to withdraw your plea on the ground that the sentence is one with which you are dissatisfied?

THE DEFENDANT: Yes, I understand that, Your Honor.

THE COURT: As I mentioned at the outset of these proceedings, Paragraph 30, which we have discussed already, is an appeal waiver, a direct appeal waiver, that is to say, a waiver of your right to take a direct appeal from my determinations, with respect to judgment and conviction and sentence to the United States Court of Appeals for the Third Circuit. Do you understand you've waived that right? You've give that right up, do you understand that?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: All right. And do you understand, Doctor, that the offenses that the plea agreement indicates you will plead to are felony offenses, and if you plead to those offenses,

those constitute -- those pleas constitute an adjudication of guilt, and that adjudication may deprive you of certain Civil Rights, such as, the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of firearm? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that, with respect to each of the three counts to which the plea agreement indicates you will plead guilty, that you'll be required to pay a fee of $100 per count, or a total of $300?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you heard Ms. Olshefski outline what the maximum possible penalties in this case are?

THE DEFENDANT: Yes, I did, Your Honor.

THE COURT: Is it necessary for me to repeat them or do you understand them?

THE DEFENDANT: I don't think so, Your Honor.

THE COURT: Now, I've made reference to the Sentencing Guidelines. Have you and counsel talked about the United States Sentencing Guidelines, for example, that, number one, they exist, and number two, that they will be taken into consideration, in determining what the appropriate sentence is in this case? Have you done that?

THE DEFENDANT: Yes, I have.

THE COURT: Do you understand that, ultimately, it's my

obligation to determine what the guideline sentence is for your case, but that I will not be able to determine the guideline sentence until after this Pre-Sentence Report that I mentioned a moment ago has been prepared and issued to you and your counsel and to Ms. Olshefski, and you've had an opportunity to challenge the facts in the report or file objections to the report? Do you understand that?

THE DEFENDANT: I do, Your Honor.

THE COURT: Do you further understand that if there are objections, those matters come to me for resolution, and I will, in fact, in due course, resolve any objections that might be raised, and once I've done that and determined what the guideline sentence is, do you understand that I have the authority, as the Judge assigned to this case, to impose a sentence that's more severe or less severe than the sentence called for by the guidelines. Do you understand that?

THE DEFENDANT: Yes, sir, I do, Your Honor.

THE COURT: In simple terms, do you understand that the guidelines are advisory only?

THE DEFENDANT: Correct, I understand that, Your Honor.

THE COURT: While you have waived your right to appeal, do you understand that, under certain circumstances, the Government may have the right to appeal any sentence that I impose?

THE DEFENDANT: Yes, I do understand that, Your Honor.

THE COURT: Now, earlier, in fact, at the outset of this hearing, I indicated that another of the required determinations that I need to make before I could accept any plea from you is that there is a factual basis to support your plea.

So, once again, I'm going to turn to Ms. Olshefski, and I'm going to ask her to outline what the evidence would be against you, if this case were to be tried. And, again, I would ask you, if you would, please, to listen carefully to her statement of what the evidence would be against you, because when she's concluded, I'm going to ask you three questions.

One, whether the evidence, her statement of the evidence is true and correct; two, whether you disagree with any part of the statement; and, three, whether you agree the Government would be able to prove those facts Ms. Olshefski will recite beyond a reasonable doubt, in court, if this case proceeded to trial.

Are you ready?

THE DEFENDANT: Yes, sir.

THE COURT: Ms. Olshefski.

MS. OLSHEFSKI: Your Honor, if this case were to proceed to trial, the United States would prove beyond a reasonable doubt that, at all times relevant to the Defendant's conduct, the Defendant was a medical doctor licensed by the Commonwealth of Pennsylvania. He held a Pennsylvania medical license, as well

as a Drug Enforcement Administration registration number.

The Defendant operated a medical practice in Scranton, Lackawanna County, within the Middle District of Pennsylvania, and the Defendant represented himself to be a specialist in Internal Medicine and Pain Management.

As a medical doctor, the Defendant was authorized to prescribe and/or dispense to patients Schedule 2 through 5 controlled substances and to prescribe medicine to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice.

Many of the prescriptions written by the Defendant for the time period specified in the indictment were not written for legitimate medical purposes and were not issued in the usual course of professional practice. Many of the unlawful prescriptions involved Schedule 2 controlled substances, which included the opioid class of drugs, such as, Oxycodone, Fentanyl and Subsys.

Many other unlawful prescriptions issued by the Defendant included Schedule 4 controlled substances, which included the Benzodiazepine class of drugs, such as, Xanax, Valium, Klonopin, among others.

Frequently, the Defendant prescribed a combination of opioids and Benzodiazepines to patients, which increased the risk of adverse consequences for the patients.

The United States would prove that contrary to accepted

medical practice, the Defendant frequently operated his medical practice by proxy. Witnesses would testify that the Defendant frequently and unlawfully delegated his DEA registration authorization to unauthorized individuals within his medical office.

Many of the prescriptions authorized by the Defendant were by way of the Defendant pre-signing blank prescriptions and allowing other employees to fill in the remainder of the prescriptions, which did not reflect the Defendant's honest exercise of good professional judgment, as to the patient's medical necessities, and were not valid prescriptions under the law.

The United States would prove that, throughout the time alleged in the indictment, the Defendant was enrolled as a Medicare provider. The Medicare Program is a Federally-funded health care benefit program that provides health care benefits to people 65 years of age or older or to certain disabled persons.

The Medicare Program is administered by the Centers for Medicare and Medicaid Services, a Federal agency within the U.S. Department of Health and Human Services. Throughout the time alleged in the indictment, the Defendant was also enrolled as a health care provider under the Federal Employees Health Benefit Program, or FEHB, a Federally-funded medical insurance program created to provide health insurance for Federal

employees, annuitants and their spouses, and dependent unmarried children under the age of 26.

The Federal Employees Health Benefits Program is administered by the U.S. Office of Personnel Management, or OPM. The Government would prove, throughout the time alleged in the indictment, the Defendant was also a health care provider under the National Association of Letter Carriers or NALC, and the Government Employees Health Association Incorporated, or GEHA, which are two insurance carriers that provide health insurance through FEHBP, NALC and GEHA, require physicians to provide a diagnostic code and a procedure code on claims, in order to be paid for professional services rendered to FEHBP beneficiaries.

Throughout the time alleged in the indictment, the Defendant was also a health care provider under the United States Department of Labor or DOL, Office of Worker's Compensation, OWCP, which administers benefits payable under the Federal Employees Compensation Act, which provides medical payments and compensation benefits to Federal employees who sustain on the job injuries.

Employees of the United States Postal Service, who become disabled, due to occupational injuries, which they sustained in the performance of their job duties, could become qualified for OWCP benefits. Health care programs administered by OWCP are health care benefit programs, as defined by Title 18 United

States Code Section 24(b).

The United States would prove that, in order for any of the above-identified health care benefit programs to pay for medications, they have to be prescribed by a physician.

In this case, the Defendant certified to all of the above health care benefit programs that he would comply with all rules and regulations associated with the programs, including that he would not present or cause to be presented a false or fraudulent claim for payment by the programs, and that he would refrain from violating the Federal Anti-kickback Statute.

The United States would prove that all of the above-identified health care benefit programs pay for claims only if the services are medically reasonable and necessary. None of the above-identified health care benefit programs will pay for medications, if the prescriptions were written in exchange for a bribe or kickback or for medications written outside the usual course of professional practice and not for legitimate medical purposes.

Regarding Subsys, specifically.

A jury would learn that the FDA approved Subsys solely for the management of break-through pain in adult cancer patients, who were already receiving and already tolerant to an around-the-clock opioid therapy for their underlying persistent cancer pain. Subsys was approved for use in dosages of 100, 200, 400, 600, 800, 1200 or 1600 micrograms. The higher the

dose, the greater the cost.

Subsys is a potent opioid containing Fentanyl that was designed to rapidly enter a patient's blood stream upon being sprayed under the tongue. A jury would learn that Fentanyl is, approximately, 70 to 100 times more potent than morphine and, approximately, 50 times more potent than 100 percent pure heroin.

Subsys is a category of drug known as Transmucosal Immediate Release Fentanyl or TIRF. Because of the risk of misuse, abuse and addiction and overdose associated with TIRF drugs, including Subsys, only practitioners enrolled in the FDA mandated TIRF Risk Evaluation and Mitigation Strategy Program, otherwise known as TIRF REMS Program, are allowed to prescribe TIRF drugs.

Practitioners are required to complete training and testing to enroll in the TIRF REMS Program. Before prescribing a TIRF drug like Subsys to a patient, the prescriber is required to complete and sign a REMS form, which explicitly states;

"I understand TIRF medications are indicated only for the management of break-through pain in patients with cancer who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent pain."

The United States would prove that, in or around May of 2012, the Defendant certified to the FDA that he would assess patients to whom he prescribed TIRF drugs, including Subsys,

for appropriateness of the dose of the TIRF drug and for signs of misuse and abuse at all follow-up visits.

The Defendant also certified that he understood that TIRF drugs, including Subsys, were indicated only for the management of break-through pain in patients with cancer who are already receiving and who are already tolerant to around-the-clock opioid therapy for their underlying persistent pain, and that an increased risk of misuse, abuse or overdose of TIRF drugs should be considered before prescribing.

The United States would prove that, in or around August of 2014, the Defendant entered into a written agreement with the manufacturer of Subsys, which was Insys Therapeutics head-quartered in Chandler, Arizona. In the written agreement, the Defendant agreed to be paid to provide speaker programs, regarding the appropriate use in the prescribing of Subsys. The Defendant falsely represented that the speaker programs would be of a professional quality, conforming to generally accepted industry standards and practices.

The United States would prove that Insys established the speaker program in or around 2012 to compensate doctors for purportedly providing educational programs to licensed health care professionals who had the capacity to prescribe Subsys and educate them about the drug.

Insys selected the Defendant to deliver speaker programs, based on his prescribing practices and his willingness to

prescribe Subsys. In reality, the primary purpose of the speaker program, the United States would prove, was to provide a financial reward to providers who were prescribing Subsys and to incentivize those providers to continue to prescribe Subsys in the future.

In exchange for receiving, approximately, $140,000 in illegal payments from Insys for purportedly providing speaker programs, beginning in 2014 into 2016, the Defendant prescribed millions of micrograms of Subsys to patients for whom Subsys was medically unnecessary, who did not suffer from break-through cancer pain, and, in fact, had no cancer diagnosis, who were not eligible for insurance reimbursement, and who had diminished understanding and appreciation of the powerful break-through cancer pain opioid prescribed by the Defendant.

An expert in the field would testify that for each such prescription, the Defendant placed the patient at grave risk. One such unlawful prescription for Subsys was written by the Defendant on February 29, 2016 for the patient identified as K.D. in Count 55 of the indictment. The unlawful prescription written by the Defendant on that date was in the strength of 1200 micrograms and a 240-dosage unit quantity.

For Count 55, the Defendant knowingly and intentionally distributed and dispensed and caused to be distributed and dispensed outside the usual course of professional practice and

not for legitimate medical purpose a 240-dosage unit quantity of Subsys, a Schedule 2 controlled substance, in the dosage unit of 1200 micrograms.

The United States would further prove to a jury that the speaker program for Insys was a sham. They lacked the appropriate audience of licensed practitioners seeking educational information regarding Subsys, that individuals who were simply friends and/or family members of the Defendant attended multiple speaker programs, and there was no serious presentation about Subsys offered by the Defendant at most events.

The United States would prove that Insys facilitated the hiring of the Defendant's brother-in-law at the Defendant's encouragement and paid the brother-in-law a lucrative salary. The brother-in-law worked within the Defendant's office to review patient charts for likely candidates for Subsys prescriptions and then worked to obtain approval from insurance providers for the unlawful payments for Subsys.

In this way, the Defendant caused Medicare and other Federal Health Care Benefit programs and private insurers to pay in excess of a million dollars for Subsys prescriptions that were medically unnecessary and prescribed outside the usual course of professional practice and, therefore, not eligible for insurance payments.

One such unlawful payment made by Medicare but caused by

Defendant is identified in Count 405 of the indictment and involves a patient identified as E.M.

On April 26, 2016, the Defendant unlawfully wrote a prescription for Subsys for E.M. in the dosage strength of 1200 micrograms and in a 240-dosage unit quantity. That prescription was written outside the usual course of professional practice and without medical legitimacy. The cost of that one unlawful prescription paid by Medicare was $25,959.76.

For Count 405, the Defendant knowingly, willfully and with intent to defraud executed and attempted to execute a scheme and artifice to defraud by submitting and causing the submission of the claim for reimbursement described above, unlawfully causing Medicare to expend $25,959.76 to cover the cost of the Subsys prescription unlawfully issued by the Defendant to E.M. on April 26, 2016.

Regarding Count 330 of the indictment, Maintaining Drug-Involved Premises, the United States would prove to a jury that the Defendant, aided and abetted by others, knowingly and unlawfully opened, leased, rented, used or maintained, whether permanently or temporarily, a medical practice located at 10 Green Ridge Street in Scranton, Lackawanna County, Pennsylvania, for the purpose of distributing controlled substances outside the usual course of professional practice and not for legitimate medical purposes.

In support of Count 30, a jury would learn that the

Defendant's primary method of pain management was to write multiple prescriptions for high dosages of Schedule 2, 3 and 4 controlled substances.

The Defendant routinely prescribed a variety of controlled substances in high dosages outside the usual course of professional practice and not for legitimate medical purposes.

Prescription drug monitoring data, for the time beginning January of 2012 through January of 2018, indicates that the vast majority of prescriptions written by the Defendant were written for Schedule 2 opioid pain medications.

In addition, Oxycodone, at highest dosage of 30 milligrams, was identified as the most prescribed opioid by the Defendant. A jury would learn that Oxycodone 30 milligram tablets is the maximum dose for immediate release formulas and the most sought after by drug abusers.

The United States would present witnesses who would testify that the Defendant prescribed a variety of controlled substances without conducting a meaningful physical examination of individuals to verify the claimed illness or condition or after conducting only a limited physical examination or without even seeing the patient. That the Defendant would frequently examine individuals for only the minimal amount of time possible, in order to see the largest number of individuals each day, and to generate the largest amount of proceeds.

That, in some instances, the Defendant issued unlawful

prescriptions for controlled substances to patients, despite indications that such patients were abusing and misusing the controlled substances that he prescribed, that the Defendant continued to prescribe excessive amounts of controlled substances to certain of his patients, knowing that such practice could result in overdoses, dependence, addiction and in at least one case death.

That numerous prescriptions for Schedule 2 opioid medications were issued by the Defendant, at a time when he was not present in the medical office, not present in the Commonwealth of Pennsylvania, and, at times, not present in the United States.

The result was that the Defendant prescribed hundreds of prescriptions for Schedule 2 opioid medications outside the usual course of professional practice and not for legitimate medical purposes.

Finally, the United States would prove that prescriptions written by the Defendant on or about January 2, 2015 for both Oxycodone and Fentanyl, for a patient identified as J.B. were prescriptions issued outside the usual course of professional practice and not for legitimate medical purposes, and that the death of J.B. resulted from his use of those controlled substances.

Your Honor, the above represents only a summary of what the United States would prove beyond a reasonable doubt had this

case proceeded to trial.

THE COURT: Thank you, Ms. Olshefski. Dr. Moran, did you listen to Ms. Olshefski outline the evidence which would be presented against you were this case to proceed to trial?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: Is the statement of the evidence, as stated by Ms. Olshefski, true and correct?

THE DEFENDANT: Excuse me, Your Honor. Could I just ask my lawyer a question?

THE COURT: Of course.

(At this time the Defendant conferred with counsel.)

THE DEFENDANT: Yes, Your Honor.

MS. OLSHEFSKI: Your Honor, if I could just interject one moment. The United States did provide Defense counsel and the Defendant with a copy of what was just read into the record regarding offense conduct.

MR. McMONAGLE: That's correct.

THE COURT: I appreciate that, thank you. You've answered my question that her statement was true and correct. Do you disagree with any part of that statement?

THE DEFENDANT: At this stage, I don't, Your Honor.

THE COURT: Do you agree the Government would be able to prove the facts Ms. Olshefski has recited here beyond a reasonable doubt, in court, if this case went to trial?

THE DEFENDANT: I believe the Government could do that, sir.

01:15 THE COURT: So your answer is, Yes?

01:15 THE DEFENDANT: Yes, it is.

01:15 THE COURT: Your answer is, Yes?

01:15 THE DEFENDANT: Yes, Your Honor.

01:24 THE COURT: Dr. Moran, has anyone forced you, in any way, to plead guilty in this case?

01:24 THE DEFENDANT: Has anyone forced me, sir?

01:24 THE COURT: Forced you.

01:24 THE DEFENDANT: No, they have not.

01:24 THE COURT: Have you been threatened, in any way, either, directly or indirectly, to cause you to plead guilty?

01:24 THE DEFENDANT: No, I have not, sir.

01:24 THE COURT: Does your plea result from any promise or promises, other than the promises in the plea agreement?

01:24 THE DEFENDANT: They do not, Your Honor.

01:24 THE COURT: I beg your pardon?

01:24 THE DEFENDANT: Maybe I misunderstood what you just asked me.

01:24 THE COURT: Sure, let me ask you again. Does your plea result from any promise or promises that are not in the plea agreement in its entirety?

01:25 THE DEFENDANT: No, Your Honor.

01:25 THE COURT: Now, I'm going to ask you for your plea, if you'd listen carefully, please.

01:25 What is your plea to the indictment filed against you on

September 15, 2020 charging, as to Count 55, Unlawful Distribution of Controlled Substances, Title 21 United States Code Section 841 subsection 1, which states;

From on or about December 2014 and continuing through January 2018, in the Middle District of Pennsylvania, you, Kurt Moran, did knowingly and intentionally distribute and dispense and cause to be distributed and dispensed, and aided and abetted the distribution and dispensing of, outside the usual course of professional practice and not for a legitimate medical purpose, the following controlled substance, which constitutes a separate count of the indictment;

Specifically, Count 55, which states as to that count, a patient identified as K.D., a prescription written on February 29, 2016 for the substance called Subsys, that's S-U-B-S-Y-S, the brand name of Fentanyl, in a strength of 1200 micrograms, in a quantity of 240 units, all of which was in violation of Title 21 United States Code Section 841 subsection (a)1, subsection (b)1(C) and Title 18 United States Code Section 2, what is your plea to Count 55?

THE DEFENDANT: May I ask my lawyer one question, Your Honor?

THE COURT: Certainly.

(At this time the Defendant conferred with counsel.)

THE DEFENDANT: Yes, Your Honor.

THE COURT: What is your plea?

THE DEFENDANT: Guilty.

THE COURT: What is your plea to Count 330 of the indictment entitled, Maintaining Drug -Involved Premises, under Title 21 United States Code Section 856 subsection (a)1, which states;

From on or about December 2014 and continuing through January 2018 in the Middle District of Pennsylvania that you Kurt Moran, aided and abetted by others, knowingly and unlawfully opened, leased, rented, used or maintained, whether permanently or temporarily, a medical practice located at 10 Green Ridge Street, Scranton, Lackawanna County, Pennsylvania, for the purposes of distributing controlled substances outside the usual course of professional practice and not for legitimate medical purposes, in violation Title 21 United States Code Section 856 subsection (a)1 and Title 18 Section 2, what is your plea?

THE DEFENDANT: Guilty, Your Honor.

THE COURT: Thirdly, what is your plea to Count 405 of the indictment entitled, Health Care Fraud, which states;

On or about the dates set forth below, within the Middle District of Pennsylvania and elsewhere, you Kurt Moran, together with others known and unknown to the Grand Jury, knowingly, willfully and with intent to defraud, executed and attempted to execute the above scheme and artifice to defraud by submitting and causing the submission of the claim for reimbursement set forth below as follows:

With respect to Count 5, the beneficiary was E.M., the date of the service was April 26, 2016, the insurance was Medicare and UHC, the claim amount was $25,959.76, and the description of the service was, again, Subsys, which is the brand name of Fentanyl, all of this in violation of Title 18 United States Code Section 1347 and Section 2, what is your plea?

THE DEFENDANT: Could I ask my lawyer one more question?

THE COURT: Indeed, you may.

(At this time the Defendant conferred with counsel.)

THE DEFENDANT: Guilty, Your Honor.

THE COURT: Very well. It's my finding that Dr. Moran is fully competent and capable of entering an informed plea in this case, it is also my finding that Dr. Moran's plea of guilty is a knowing and voluntary plea, that it is supported by an independent basis in fact, containing each of the essential elements of the offenses set forth in Counts 55, 330 and 405 set forth in the indictment, which I recited to Dr. Moran before I asked for and he entered his plea.

Since, Dr. Moran, you acknowledge that you are, in fact, guilty as charged, in connection with those three charges, that you have had the assistance of counsel in the persons of Mr. Levant and Mr. McMonagle, that you know your rights to a trial and what rights you would have at trial, that you know what the maximum possible punishment is in this case, and you are voluntarily pleading guilty, I will accept your plea of guilty

and enter a judgment of guilty on your plea.

Now, earlier, we talked about the need for the issuance of the Pre-Sentence Report, and for that purpose, I will order a pre-sentence investigation, and I will set the date for the disclosure of the Pre-Sentence Report to you and your counsel and to Ms. Olshefski as February 2, 2022.

When you receive the report, you'll have 14 days thereafter within which to submit comments on or objections to the Pre-Sentence Report, and, of course, in that regard, you should continue to confer and consult with your counsel.

Sentencing in this matter is tentatively scheduled for the week of March 14, 2022. The specific date and time will be sent to everyone at a later date.

The only other issue that appears, right now, is whether the Government is seeking detention at this time?

MS. OLSHEFSKI: Your Honor, the United States is not seeking detention at this time. Dr. Moran has remained on release pre-trial, we have no reports of any violations. We don't believe he's a flight risk, and given the fact that his medical license has been suspended, he no longer has a DEA registration, he does not present a danger to the community, in terms of prescribing.

THE COURT: Thank you. Well, Dr. Moran, whatever conditions were imposed on you remain on you, for purposes of your being free pending sentence.

MS. OLSHEFSKI: Your Honor, there is one more document. The Defendant, I believe, has signed Defendant's Acknowledgement of Rights Waived by Guilty Plea, which is the written version of the rights that he has waived that Your Honor has colloquied him on, and I would just ask that the Defendant acknowledge that document and that it be filed of record.

THE COURT: Certainly.

MR. McMONAGLE: Your Honor, I presented this document to Dr. Moran, he acknowledges that he signed this particular document on Page 6, and it sets forth all the rights that he gave up by pleading guilty.

THE COURT: You've read that before you signed it, Doctor?

THE DEFENDANT: I did, sir. I'm not a hunter.

THE COURT: I see. Is there anything else, Ms. Olshefski?

MS. OLSHEFSKI: No, Your Honor. Thank you.

MR. McMONAGLE: Your Honor, nothing further. Thank you, sir.

THE COURT: All right, thank you all very much.

(At this time the proceedings were adjourned.)

C E R T I F I C A T E

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

S/Kristin L. Yeager
KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter

REPORTED BY:

KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter
United States District Court
Middle District of Pennsylvania
P.O. Box 5
Scranton, Pennsylvania 18501

(The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)